IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| CAROLYN C. LAMB, EDMUND A. CHESTER, and CYNTHIA CHESTER, | ) ) ) | 8:09CV95 |
| Plaintiffs, | ) ) | |
| v. | ) ) | MEMORANDUM AND ORDER |
| ITT CORPORATION, | ) ) | |
| Defendant. | ) ) ) | |

This matter is before the court on the defendant's motion to dismiss, Filing No. 14. The court heard oral argument on the motion on September 30, 2009. This is an equitable action to recover the proceeds of a $22,000,000 settlement between defendant ITT and an Italian Corporation, STET International, S.p.A. ("STET"). Jurisdiction is premised upon diversity of citizenship under 28 U.S.C. § 1332.

This action involves the nationalization of assets by the government of Cuba after the Cuban Revolution, the United States' embargo on Cuban goods, the Cuban Liberty and Democratic Solidarity Act of 1996, 22 U.S.C.A. § 6021 et seq. (the "LIBERTAD Act"),[1] and an agreement between ITT and STET. STET is an Italian company that acquired an interest in the former Cuban Telephone Company ("Cutelco"). The plaintiffs are the children and heirs of former stockholders of Cutelco and the defendant was formerly the majority stockholder of Cutelco. ITT and STET entered into an agreement that settled

---

[1]In 1963, the United States imposed an embargo on Cuba. See *Havana Club Holding, S.A. v. Galleon S.A.*, 203 F.3d 116, 120 (2d Cir. 2000). In 1996, Congress codified the regulations implementing the embargo in the Cuban Liberty and Democratic Solidarity Act of 1996 ("LIBERTAD Act"), 22 U.S.C. § 6032(h). The LIBERTAD Act also strengthened international sanctions against the Castro government and protected the confiscated assets of U.S. nationals from dealings–i.e., "trafficking" in the confiscated property–by third parties. See 22 U.S.C. § 6022 (2) & (6).

ITT's potential claims under the LIBERTAD Act and enabled STET to continue to do business with the Cuban telephone company.  The plaintiffs seek an accounting, recovery of "their just share" of funds paid to ITT in connection with the settlement, and attorney fees.

### I.  BACKGROUND

The following facts are alleged in the complaint and demonstrated in the documents attached thereto.  *See* Filing No. 1, Complaint, Exhibits ("Exs.") A - F.  Before the Cuban Revolution, the defendant's predecessor in interest, International Telephone and Telegraph Corporation, owned the majority of shares of Cutelco and operated it as a partially-owned subsidiary.  *Id.*, Complaint at 2.  The plaintiffs' parents, along with others, were minority shareholders in the company.  *Id.*, Complaint at 3.  The plaintiffs' parents are deceased and the plaintiffs have succeeded to their interest.  *Id.*

In 1960, the Cuban government nationalized private property and confiscated Cutelco's assets.  *Id.*, Complaint at 2.  In 1970, pursuant to the International Claims Settlement Act of 1949, 22 U.S.C. § 1621, Cutelco shareholders, including ITT and the plaintiffs' parents, Edward and Enna Chester, submitted claims for their confiscated property to the Foreign Claims Settlement Commission of the United States ("the Commission").  *Id.*, Complaint at 2, 3; Exs. A, Commission Decision No. CU 5013 ("ITT Decision") & B, Commission Decision No. CU 5824 ("Chester decision").  The Commission notes in its decisions that the Claims Settlement Act does not provide for payment of claims, but for the determination by the Commission of the validity and amounts of such claims and the certification of its findings to the Secretary of State "for possible use in future negotiations with Cuba."  *Id.*, Ex. A at 11; B at 6.  The Commission certified that the value of Cutelco's total assets at the time they were seized was approximately

2

$135,000,000.  *Id.*, Ex. A at 10.  ITT's claim was certified at the value of approximately $50,000,000 and other claims, including the plaintiffs' parents' claim, were certified as worth approximately $5,000,000 in total.  *Id.* at 7-10*.*  The  plaintiffs' parents' claim was worth approximately $489,208.  *Id.,* Ex. B at 6.  The value of remaining interests, for which no claims were filed, was approximately $80,000,000.  *Id.*, Complaint at 3; Ex. A at 10.

The Commission included a "Certification of Unclaimed Assets" provision certifying the approximately $80,000,000 loss of the claimants who had not filed claims to ITT "in trust for the benefit of non-claimant shareholders and creditors of Cutelco" in ITT's certification.  *Id.* at 10.  The certification provided that the distribution of the trust was to be made in accordance with the laws of the State of Delaware and with Title V of the International Claims Settlement Act, "with preference to be given to creditors, preferred stockholders and common stockholders in that order" and "the distributions [were] to be made on the same pro rata basis as employed in determining any payment made to successful claimants against the Government of Cuba."  *Id.*  No payments by Cuba have ever been negotiated.  Filing No. 1, Complaint at 3.

Later, in order to strengthen the United States' embargo against Cuba and to "protect United States nationals against confiscatory takings and the wrongful trafficking in property confiscated by the Castro regime," Congress enacted the Cuban Liberty and Democratic Solidarity Act ("LIBERTAD Act") (also known as the Helms Burton Act).  22 U.S.C. § 6022 (2) & (6); Filing No. 1, Complaint at 4.  Under Title III of the Act, United States nationals who owned property in Cuba confiscated by the Cuban government since January 1, 1959, were provided a private right of action for recovery of damages, in the amount of claims determined and certified by the commission, from any person who traffics in such confiscated property.  Filing No. 1, Complaint at 4; 22 U.S.C. § 6082(a) (1)(A)(i).

The civil remedy provisions of the Act have been suspended by successive presidents since the enactment of the Act.   Filing No. 1, Complaint at 4.  Title IV of the Act provides for the exclusion from the United States of persons trafficking in confiscated property without the authorization of a United States national who holds a claim to the property. Filing No. 1, complaint at 4-5; 22 U.S.C. § 6091(b)(2)(A).

In 1995, the Cuban government privatized the Cuban telephone system and an Italian corporation, STET International S.p.A., became the owner of a 25% share of the Cuban phone system.  Filing No. 1, Complaint at 3.  In 1996, the State Department notified STET that it had been identified as a trafficker in Cuban assets and advised of the risk that its corporate officers or employees could be subject to exclusion under Title IV for activities involving its partial ownership of the Cuban Telephone Network.  *Id.,* Complaint at 6; Ex. C, ITT/STET Agreement at 4.

In order to minimize its risk of exposure to potential suit under Title III of the Libertad Act, and to obtain a license to avoid exclusion of its personnel from the United States under Title IV of the Act, STET entered into an agreement with ITT whereby ITT agreed, for a period of ten years, to waive its right to bring an action under the LIBERTAD Act in exchange for payment of $22,000,000.  *Id.*, Complaint at 5; Ex. C, ITT/STET Agreement at 7-9.  ITT also agreed to cooperate with STET to contact appropriate officials with the objective of obtaining a license for STET to avoid exclusion from the United States under Title IV of the Act.  *Id.*, Complaint at 5; Ex. C, ITT/STET Agreement at 9-10.  The payment of $22,000,000 was conditioned on "assurance by the United States Department of State of a communication acknowledging notification by the ITT parties of this Agreement and stating that the Department has terminated without adverse action its inquiry regarding STET International and any of its affiliates under Title IV."  *Id.* at 9.  In the Agreement, ITT

represented that it had "full power and authority to enter into [the] AGREEMENT on behalf of the ITT Parties . . . and that one or more of the ITT parties [were] trustees for the Non-Claimant beneficiaries pursuant to the award." *Id.* at 11. ITT further agreed to return a pro-rata share of the settlement funds if STET personnel were excluded from the United States during the Agreement period. *Id.* at 9.

Pursuant to ITT's application, STET was granted a license by the Department of the Treasury. *Id.*, Complaint at 6; Ex. D, Cuban Assets Control Regulations License. The license authorized ITT and STET to enter into the Agreement, authorized STET to "take any action with respect to the Cuban Telephone System for a period of ten years" under the Agreement and authorized ITT to receive consideration from STET pursuant to the Agreement. *Id.,* Ex. D at 2. The State Department issued a press statement stating that it had reviewed the Agreement and concluded that "the agreement constitute[d] 'authorization of [a] United States national who holds a claim to the property' consistent with Title IV." *Id.*, Ex. E at 1 (alteration in original). The press statement further indicated that the Department had "therefore, terminated without adverse action the investigation which had been ongoing related to STET International's and its affiliates' use of ITT's confiscated property in Cuba." *Id.* ITT published a notice to the creditors and shareholders of Cutelco, informing them of potential entitlement for a portion of funds upon proof of an interest in Cutelco and a statement that the creditor or shareholder had not filed a claim with the commission. *Id.*, Complaint at 6; Ex. F, Announcement. The plaintiffs did not receive actual notice of the settlement. *Id.*, Complaint at 6.

In its motion to dismiss, ITT argues that the plaintiffs' complaint fails to state a claim for relief because there is no legal or equitable theory under which the plaintiffs could claim an entitlement to the settlement proceeds. It argues that the complaint fails to state a

statutory claim, an unjust enrichment claim, or a breach of fiduciary duty claim.  Further, it argues that payment of proceeds to non-parties of the ITT/STET agreement would violate the terms of the Treasury Department authorization to ITT.  In response, plaintiffs argue that several theories support their equitable claims.   They argue that the defendant breached its fiduciary duties as a majority shareholder, as a dominant shareholder and as a trustee to account to minority shareholders.  They argue that the defendant usurped a corporate opportunity for itself and not the shareholders as a whole.  They also argue the ITT's agreement with STET is analogous to a sale of the assets of a corporation winding down its activities, and as controlling shareholder, ITT was obligated to share the proceeds.  They further argue that the ITT/STET Agreement is contrary to the purpose of the LIBERTAD Act to benefit all United States nationals who were certified claimholders, and that any benefits ITT was able to obtain by virtue of its dominant position rightfully belong to all claimholders under the LIBERTAD Act's statutory scheme.  Also, they argue that their position is similar to those of third-party beneficiaries of a contract.

II.  DISCUSSION

A.  Law

Under the Federal Rules, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  The rules require a "'showing,' rather than a blanket assertion, of entitlement to relief."  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 n.3. (2007) (*quoting* Fed. R. Civ. P. 8(a)(2)). "Specific facts are not necessary; the statement need only 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'"  *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (*quoting Twombly*, 550 U.S. at 555).  In order to survive a motion to

6

dismiss under Fed. R. Civ. P. 12(b)(6), the plaintiff's obligation to provide the grounds for his entitlement to relief necessitates that the complaint contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly,* 550 U.S. at 555.

The factual allegations of a complaint are assumed true and construed in favor of the plaintiff, "even if it strikes a savvy judge that actual proof of those facts is improbable and 'that a recovery is very remote and unlikely.'" *Id.* (*quoting Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974)). "On the assumption that all the allegations in the complaint are true (even if doubtful in fact)," the allegations in the complaint must "raise a right to relief above the speculative level." *Twombly,* 550 U.S. at 555-56. In other words, the complaint must plead "enough facts to state a claim for relief that is plausible on its face." *Id.* at 547. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* — U.S. —, —,129 S. Ct. 1937, 1949 (2009) (stating that the plausibility standard does not require a probability, but asks for more than a sheer possibility that a defendant has acted unlawfully.).

*Twombly* is based on the principles that (1) the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions and (2) only a complaint that states a plausible claim for relief survives a motion to dismiss. *Id.* at —, 129 S. Ct. at 1949-50. Determining whether a complaint states a plausible claim for relief is "a context-specific task" that requires the court "to draw on its judicial experience and common sense." *Id.* at —, 129 S. Ct. at 1950. Accordingly, under *Twombly*, a court considering a motion to dismiss may begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. *Id.* Although legal

conclusions "can provide the framework of a complaint, they must be supported by factual allegations." *Id.* When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief. *Id.*

Thus, the court must find "enough factual matter (taken as true) to suggest" that "discovery will reveal evidence" of the elements of the claim. *Twombly,* 550 U.S. at 558, 556; *Dura Pharms., Inc. v. Broudo,* 544 U.S. 336, 347 (2005) (explaining that something beyond a faint hope that the discovery process might lead eventually to some plausible cause of action must be alleged). When the allegations in a complaint, however true, could not raise a claim of entitlement to relief, the complaint should be dismissed for failure to set a claim under Fed. R. Civ. P. 12(b)(6). *Twombly,* 550 U.S. at 558; *Iqbal,* — U.S. at —, 129 S. Ct. at 1950.

The LIBERTAD Act codified the economic embargo of Cuba and strengthened international sanctions. *See* 22 U.S.C. §§ 6032(h), 6033-6046. Title III of the Act permits any United States national "who owns a claim to such [confiscated] property for money damages" to sue those who traffic in such property. *See id*; 22 U.S.C. § 6082(a)(1)(A). It creates a civil cause of action for damages in the amount that was certified by the Foreign Claims Settlement Commission.[2] *See* 22 U.S.C.A. §§ 6081-84. Trafficking includes selling, transferring, buying, leasing, as well as "engag[ing] in a commercial activity using or otherwise benefitting from confiscated property." *Id.* at § 6023(13). The Act also

---

[2]The Act favors certified claims. United States nationals who were eligible to file a claim with the Foreign Claims Settlement Commission, but did not do so, may not bring an action on that claim. 22 U.S.C. § 6082(a)(5)(A). However, courts could appoint special masters to make determinations regarding the amount and ownership of a claim for evidentiary purposes in Title III actions on claims that had not been certified. 22 U.S.C. §§ 6083(a)(2). A claim certified by the commission is conclusive proof of ownership of an interest in property. 22 U.S.C. § 6083(a)(1). Any person bringing an action under this section whose claim has not been so certified shall have the burden of establishing for the court that the interest in property that is the subject of the claim is not the subject of a claim so certified. 22 U.S.C. § 6082(5)(D).

provides for treble damages in some circumstances.  22 U.S.C. § 6082(a)(1)(C)(ii).  The

Act also provides:

> In the event some or all actions brought under this section are consolidated
> by judicial or other action in such manner as to create a pool of assets
> available to satisfy the claims in such actions, including a pool of assets in
> a proceeding in bankruptcy, every claimant whose claim in an action so
> consolidated was certified by the Foreign Claims Settlement Commission
> under title V of the International Claims Settlement Act of 1949 [22 U.S.C.A.
> § 1643 *et seq.*] shall be entitled to payment in full of its claim from the assets
> in such pool before any payment is made from the assets in such pool with
> respect to any claim not so certified.

22 U.S.C. § 6082(f)(2)(B).  Further, the President can suspend operation of Title III, and

each  President  has  done  so  since  that  bill  was  enacted.  *See,*  e.g.,

http://www.whitehouse.gov/news/releases/2005/1/20050114-4.html. (President George W.

Bush  suspension);  www.whitehouse.gov/the_press  _office/Letter  from  the  President

regarding Cuba (July 14, 2009) (President Barack Obama suspension).

Title IV of the Act provides sanctions, including exclusion from the United States,

against aliens who traffic in such confiscated property "without the authorization of any

United states national who holds a claim to the property."  22 U.S.C. §§ 6082(a)(2);

6091(a) (emphasis added).  The Cuban Embargo and the LIBERTAD Act are administered

by the Secretary of the Treasury, who has delegated that authority to the Office of Foreign

Assets Control ("OFAC"), which has promulgated regulations under the statute.  *See* 31

C.F.R. § 515.802; 31 C.F.R. Part 515.  The Regulations prohibit transactions involving

Cuba except when "specifically authorized by the Secretary of the Treasury . . . by means

of regulations, rulings, instructions, licenses or otherwise."  31 C.F.R. §§ 515.201.  At the

time of the ITT/STET Agreement in 1997, the regulations permitted issuance of both

general licenses that permit classes or categories of transactions with Cuban nationals and

specific licenses based on individualized determinations and approval by OFAC.  *See* 31

C.F.R. § 801 (1997); *e.g.*, 515.542 (mail and telecommunications-related transactions). The OFAC had considerable discretion to authorize otherwise prohibited transactions by way of licenses.  *Havana Club Holding, S.A. v. Galleon S.A.*, 961 F. Supp. 498, 500 (S.D. N.Y. 1997).

"Titles III and IV of the Helms-Burton Act do not provide that those whose property was taken by the Cuban government retain legal title to that property."  *Glen v. Club Mediterranee S.A.*, 365 F. Supp.2d 1263, 1269 (S.D. Fla. 2005) (involving a suit by the former owner of beachfront property in Cuba against Club Med for commercial exploitation of the property).  Rather, "[t]itles III and IV simply imply that people like the [former owners] may own a claim for compensation under U.S. law, but they do not own the expropriated land itself."  *Id.* at 1269-70.  Thus, claims predicated on continued *ownership* of the property are not cognizable.  *See, e.g., id.* at 1270 (holding that unjust enrichment and trespass claims were foreclosed under the Act of State doctrine, since they would require the court to make a determination of rights in the wake of the sovereign acts of the Cuban government).

The interrelated theories of unjust enrichment, breach of fiduciary duty, constructive fraud, shareholder derivative actions and actions for accountings present equitable claims. *See Professional Recruiters, Inc. v. Oliver*, 456 N.W.2d 103, 108 (Neb. 1990) (unjust enrichment); *Fletcher v. Mathew*, 448 N.W.2d 576, 582 (Neb. 1989) (fiduciary duty); *Crosby v. Luehrs*, 669 N.W.2d 635, 643 (Neb. 2003) (constructive fraud); *Trieweiler v. Sears*, 689 N.W.2d 807, 827 (Neb. 2004) (shareholder derivative *actions); Philip G. Johnson & Co. v. Salmen*, 317 N.W.2d 900, 902 (Neb. 1982) (accounting).  Equity is not a rigid concept, and its principles are not applied in a vacuum, but instead, equity is determined on a case-by-case basis when justice and fairness so require.  *Manker v.*

*Manker*, 644 N.W.2d 522, 537 (Neb. 2002). Where a situation exists that is contrary to the principles of equity and that can be redressed within the scope of judicial action, a court of equity will devise a remedy to meet the situation. *Anderson v. Bellino*, 658 N.W.2d 645, 658 (2003). Equity looks through forms to substance; thus, a court of equity goes to the root of the matter and is not deterred by forms. *Trieweiler*, 689 N.W.2d at 836. Equity will always strive to do complete justice. *Id.* The controlling objective is to make the plaintiff whole. *Id.*

In order to state a claim for unjust enrichment, a plaintiff must plead facts alleging that the plaintiff conferred a benefit upon the defendant such that it would be inequitable or unconscionable to permit the defendant to retain such benefit without compensating the plaintiff therefor. *See Professional Recruiters, Inc. v. Oliver*, 456 N.W.2d 103, 108 (Neb. 1990). Unjust enrichment requires restitution, which measures the remedy by the gain obtained by the defendant, and seeks disgorgement of that gain. *See Ahrens v. Dye*, 302 N.W.2d 682, 684 (1981). In other words, when damages are based upon unjust enrichment, a defendant is liable only to the extent of the enrichment. *Trieweiler v. Sears*, 689 N.W.2d 807, 834-35 (Neb. 2004).

A claim for breach of fiduciary duty arises from a fiduciary relationship. *See, e.g., Fletcher*, 448 N.W.2d at 582 (involving power of attorney and agency). A fiduciary relationship can also be implied in law. *See, e.g., Eggleston v. Kovacich*, 742 N.W.2d 471, 478-79 (Neb. 2004) (holding that if a person obtains title to property as the result of abuse of an influential or confidential relationship such as position as an attorney in fact, the equitable remedy of imposition of a constructive trust is the appropriate remedy); *Crosby*, 669 N.W.2d at 643 (involving agent and principal). A constructive trust is an equitable remedy intended to prevent unjust enrichment. *Manker*, 644 N.W.2d at 536.

Majority shareholders may be held liable for damages for breach of a fiduciary obligation to minority shareholders. *Trieweiler,* 689 N.W.2d at 830; *Anderson v. Clemens Mobile Homes,* 333 N.W.2d 900, 904 (Neb. 1983) (1983) (holding, with respect to a closely-held corporation, that the trial court had not erred in permitting a minority shareholder a direct recovery from the majority shareholder); *Evans on Behalf of D & E Copiers, Inc. v. Engelhardt,* 518 N.W.2d 648, 650-51 (Neb. 1994). Similarly, an officer or director of a corporation occupies a fiduciary relation toward the corporation and its stockholders, and is treated by the courts as a trustee. *Evans,* 518 N.W.2d at 651. Where directors are empowered to sell all the assets of a corporation, they must act with at least that degree of care that ordinarily prudent men would exercise in their own affairs. *Doyle v. Union Ins. Co.,* 277 N.W.2d 36, 41-42 (Neb. 1979). Similarly, a trustee is required to dispose of trust property on the most advantageous terms which it is reasonably possible for him to secure for the benefit of those whom he represents. *Id.* at 44.

The traditional remedy imposed by courts upon a finding of a misappropriation of a corporate opportunity is the impression of a constructive trust in favor of the corporation upon the property. *Trieweiler,* 689 N.W.2d at 834. A constructive trust is an equitable remedy intended to prevent unjust enrichment. *Manker,* 644 N.W.2d at 536.

B.   Analysis

The court finds the plaintiffs' complaint states a claim for equitable relief. The plaintiffs have alleged facts that, taken as true, allow the court to draw the reasonable inference that the defendant is liable for the actions alleged. The plaintiffs' factual allegations show that ITT was in a position similar to that of either an officer, director, trustee, or majority shareholder who would have had some obligation or duty of fair dealing

to minority shareholders. The allegations of the complaint allow the court to infer that ITT has been unjustly enriched as a result of the agreement with STET.

By accepting payment in exchange for its efforts to secure a license for STET, ITT arguably usurped an opportunity properly belonging to all claimholders. The agreement between ITT and STET shows that STET's primary goal was that its employees and officers would not be excluded from doing business in the United States under Article IV of the LIBERTAD Act. The significance of ITT'S or the other claimants' ostensible private rights of action is questionable in view of the suspension of Title III of the Act. The minority shareholders undoubtedly lost any bargaining power they might have had individually when STET obtained the license as a result of ITT's efforts. Only ITT, and not other shareholders/claimholders, profited from the grant of the license. Moreover, it appears that by including the provision that ITT would return a pro-rata share of the proceeds if a STET employee were to be excluded, ITT may have implicitly indemnified STET from any potential claims by others.

Under the facts of this case, ITT clearly has duties in trust for the nonclaimant shareholders and creditors. Arguably, it would also owe some duty, at least a duty to provide notice, to the other claimants. At the least, the allegations of plaintiffs' complaint give rise to the implication that the plaintiffs are entitled to an accounting. It seems that the Foreign Claims Settlement Commission's finding with respect to ITT's claim contemplates a distribution of whatever sums might eventually be recovered to claimants in proportion to their ownership interests.

The international tribunal's certification of the value of unfiled claims to ITT in trust signifies the creation of some role for ITT to act as a director or officer, agent, or other

13

representative, of the confiscated corporation and its shareholders.  If the International Commission wanted ITT, as majority shareholder, to protect the rights of the shareholders who had not filed claims, surely a similar role was contemplated with respect to claimant shareholders.  The spirit, if not the letter, of the LIBERTAD Act would not be honored by the provision of more benefits to nonclaimants than to claimants.

Moreover, the plaintiffs' claim is not premised on ownership of confiscated assets, but on ownership of a claim.  At this stage of the proceedings, the court finds that the plaintiffs have alleged facts that show it could be entitled to equitable relief.  Accordingly,

IT IS ORDERED that:

1.      The defendant's motion to dismiss (Filing No. 14) is denied.

2.      The defendant shall file a responsive pleading within 14 days of the date of this order.

DATED this 26th day of January, 2010.

BY THE COURT:


s/ Joseph F. Bataillon
United States District Judge

---

*This opinion may contain hyperlinks to other documents or Web sites.  The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites.  Likewise, the court has no agreements with any of these third parties or their Web sites.  The court accepts no responsibility for the availability or functionality of any hyperlink.  Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.